[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff (hereinafter Hinckley) seeks a dissolution of marriage, an assignment of property, counsel fees and other equitable relief.
The defendant, (hereinafter Cancela) filed her answer admitting allegations of the first count alleging irretrievable breakdown, and denying the allegations of intolerable cruelty in the second count.
Cancela filed a cross-complaint seeking for a dissolution on the grounds of irretrievable breakdown and requesting similar relief.
The Court makes findings and enters orders as follows:
 I Factual Findings
The parties intermarried at Moodus, Connecticut on July 11, 1986 and have been residents of Connecticut for longer than twelve-months CT Page 11716 next preceding the date of the filing of the complaint.
There are no minor children issue of the marriage and no governmental agency is contributing to the support of either party. Based on the admissions of irretrievable breakdown in the pleadings, and on the evidence presented, the Court finds that the marriage has broken down irretrievably without any reasonable prospect of reconciliation. The marriage is ordered dissolved on the grounds of irretrievable breakdown. (The allegations of intolerable cruelty alleged in the second count of the complaint were not proven.)
The relationship between the parties began in June, 1983. At the time both were employees of Connecticut Bank Trust Co. Eventually (sometime in early 1985) they began living together. Hinckley kept asking Cancela to marry and she kept declining. Cancela had been married before, had gone through a bitter dissolution with a very unsatisfactory resolution of financial and property orders, and she was adamant about protecting her assets in the future. Finally, after Hinckley gave Cancela an ultimatum to marry him or he would leave, including comments about committing suicide if she would not do so, Cancela agreed to marry him as long as he understood and agreed to three express conditions. First, there would be no children. Second, both parties would continue to work and support themselves. Third, they would keep their earnings and assets individually and separately, except for sharing household and living expenses.
In fact this arrangement was already in place before the marriage and was merely a reaffirmation of their living pattern. Hinckley assented to these terms — his testimony was to the effect that he would have done anything Cancela asked to get her consent to marry.
In keeping with the agreement, the parties kept separate bank accounts, separate credit cards, separate automobiles and separate IRA accounts.
Cancela prepared a budget for household expenses, which Hinckley agreed to and they rigorously adhered to the budget. The two would sit down regularly to go over household bills and their own individual expenses. Checks would be drawn to pay the creditors.
The checks were generally drawn on an account in Cancela's CT Page 11717 name. In order to cover those payments which were his responsibility, Hinckley would give Cancela a check which she deposited in her account upon which the checks were drawn. This procedure was done for economy (free checking) and convenience.
In keeping with their financial arrangement, Cancela kept meticulous records of the amounts each put into her account and all the checks drawn against that account, including whether the checks were for debts personal to each or for shared household expenses.
Over the years Cancela's savings grew substantially while Hinckley's were consistently nominal. The two primary reasons for the disparity were that Cancela earned substantially more money than Hinckley and thus had excess which could be saved. The second reason is that Cancela was clearly focused on accumulating savings. It was important to her that she have financial security. Hinckley, on the other hand, was by his own admission a spender who lacked the desire or discipline to consider savings a priority matter.
Hinckley now claims that the money in Cancela's several bank accounts totaling approximately $110,000. is for the most part, a joint asset to which he is entitled to 65%. Cancela's position is that he is entitled to none of it because they are not joint funds, but rather by agreement and for equitable reasons are hers solely. Other factual findings will be made as appropriate to the issues.
 II Antenuptial Agreements
On May 25, 1986, the parties signed a document entitled "Prenuptial Agreement." The document contained a list of personal property which would remain the sole property of Cancela as well as three items identified as common property."
On September 30, 1986, the parties signed a separate document indicating that Cancela owned 75% in a jointly owned condominium at 1411 Sunfield Drive in South Windsor, with Hinckley owning a 25% interest. Cancela claims this was an antenuptial agreement, although it was signed after the marriage, because, she claims, Hinckley agreed to its terms before the date of marriage. As evidence, she submitted a document entitled "% of Ownership 5/30/86" indicating her contribution to the condo purchase was $12,123. while Hinckley's was $3,038. (Exhibits J and 6). While CT Page 11718 these documents corroborate Cancela's testimony about maintaining all of their assets separately, the Court cannot conclude they establish a valid antenuptial agreement. The requirements of such agreements are found in McHugh v. McHugh, 181 Conn. 482 (1980). That case established the duty of parties to the agreement to inform the other fully as to the amount, character and value of individually owned property. There is no burden to inquire, but a positive one to fully disclose their respective assets. The Court cannot conclude this was done, therefore it will consider its orders pursuant to Connecticut General Statute 46b-81 (a valid antenuptial agreement could operate to waive consideration of this statute). In passing, it is noted that P.A. NO. 95-170 codifies premarital agreements, but that act applies to agreements made on and after October 1, 1995.
The Court will, however, weigh the evidence in its determination as to an equitable distribution of marital assets.
 III Requests of the Parties
Connecticut General Statutes Section 46b-81 sets forth the criteria to be used in determining the distribution of assets. The Court is cognizant of those provisions and gives careful consideration to them. They are discussed briefly as follows:
1. Length of Marriage:
The parties married in July, 1986. Hinckley moved out of the marital home on March, 1994 and it seems reasonable to term this marriage one of moderate duration.
2. Cause for the marital dissolution:
The Court does not accept Hinckley's position that Cancela's attitude of superiority and her treatment of him as a lesser person than she led to the breakdown. Rather, it appears that Cancela expressly stated the conditions of the marriage to him and her personality and behavior remained essentially unchanged after the marriage. While Hinckley was aware of and accepted these conditions (he would have agreed to anything to persuade Cancela to marry him), he unrealistically hoped they could have a more conventional arrangement once they were married. When that did not happen, he decided to end the relationship. His attorney described CT Page 11719 him as naive, and to some extent that appears correct, but, in fact, the marriage broke down because Hinckley no longer wished to continue the relationship which he was explicitly told and understood would be in place.
3. Age, health, station, occupation, amount and source ofincome, vocational skills, employability, opportunity to acquirefuture assets:
Both parties are in their late thirties and in good health. They are both employable. Cancela has a Master's Degree in Business and is in marketing management. Hinckley has some college credits and has a background in computer technology. Cancela's future earning capacity is likely to exceed Hinckley's by as much as a 2 to 1 ratio, but both are capable of supporting themselves and neither seeks alimony from the other. The Court is not required to give equal weight to any specific provisions and under the unconventional factual circumstances of this case, for equitable reasons does indeed give less weight to some of the factors. Weinstein v. Weinstein, 18 Conn. App. 622, 633 (1989).
4. The contribution of each party to the value of theirrespective estates:
This also includes nonmonetary contributions such as homemaking, O'Neil v. O'Neil, 13 Conn. App. 300, 311-12 (1988).
The evidence clearly established that Cancela was essentially the sole contributor to her estate. As shown by the detailed financial records, there is a paper trail attesting to the monetary contributions of each party to what they agreed would be joint expenses. Hinckley, who did not earn nearly as much as Cancela, would accumulate modest savings from time to time, but they would be spent or depleted more or less regularly. The parties, by intent and agreement kept their own separate finances, expenses, and savings, and even when their incomes were not disparate, at a time when they were saving for the down payment on their condo, Cancela saved at more than double the rate of Hinckley. Further corroboration of the contributions to assets is found in the work history of the parties. In 1990 Cancela was laid off from her job with a severance package of approximately six months pay. She was able to find a new job at a higher salary within a few weeks and banked most of her severance pay plus saved a higher rate from her higher current earnings. In contrast, when Hinckley was laid off, he went for almost two and one half years CT Page 11720 without a steady new job, and his income during that time was his severance pay, (which went to shared expenses) unemployment compensation and an occasional temporary job. During that time, when Hinckley did not always have enough money to pay even his share of the household costs, Cancela added some $40,000. to her savings. His nonmonetary contributions to Cancela's assets are not any more significant then hers.
The following orders are entered:
1. The husband shall quit claim his intent in the jointly owned condominium at 1411 Sunfield Drive, South Windsor, to the wife. The wife shall assume, indemnify and hold the husband harmless on the mortgage, condo fees, assessments, taxes or other liens or expenses relating to said property.
 The parties have stipulated that the condo has a fair market value of $76,000. and an outstanding mortgage balance of $48,762. In keeping with the agreement and intent of the parties as well as recognizing the contribution of each party to the asset, the wife shall pay the husband 25 % of said equity — which is $6809.50.
Both deed and payment to be within 30 days of this decision.
2. Each party shall keep and retain their individual assets as shown on their respective financial affidavits, including motor vehicles, bank accounts, stocks, IRA's, CD accounts, etc.
3. Each party shall be responsible for the liabilities shown, on their own financial affidavits.
4. When the husband vacated the marital home, he took a substantial number of items of personal property. (Defendant's exhibit 17). While the value placed on these items is in dispute, it is nonetheless the fact that he took all those items he felt were his or that he otherwise wanted to take. His present request for a llama wool blanket (a gift from the wife's mother), a model ship and an Anna Lee doll are denied.
5. Each party shall be entitled to their individual passports and any such being held by the non-owner shall be returned to the owner's attorney within 30 days. CT Page 11721
6. Each party shall be responsible for his or her own counsel fees. While the wife has substantially more assets, this is not a typical dissolution matter. Weighing the equities and the circumstances, including the outcome, the Court does not believe the wife should be ordered to contribute to the husband's counsel fees. While their assets are not in parity, the husband is not without means to pay his own attorney.
Klaczak, J.